Good morning. My name is Andy Vickrey. I'm a lawyer from Houston, Texas. I'm here today on behalf of Yvonne Laisure-Radke. You know, every lawyer who passes the bar and comes into a room configured like this in America is concerned about the appearance of justice, about the integrity of our proceedings. Every judge that dons the robe and sits on the bench should be concerned about the appearance of justice. Here is a case where the district judge granted summary judgment against my client solely, solely, on what he perceived to be the appearance of some counsel to represent her in a wrongful death claim regarding the death of her husband. That lawyer, after talking to several Washington lawyers, decided, this is a histrionic widow. She doesn't have a legitimate claim. That's not an asset I need. Now, the significance of this is that under all of your cases, including Jones that we cited, Yannis we cited, and Hamilton that they rely upon principally, the judicial estoppel doctrine exists to prevent some kind of chicanery, some kind of manipulation, blowing hot and cold in one breath, playing fast and loose with the courts. That's all over the decisions of this court and of other courts. There is no finding, there is no evidence of anything manipulative or any chicanery on her part. Now, you know, another issue before the court is, well, gee, what about the fact that Yvonne was not the personal representative of the estate? Well, you want to talk about blowing hot and cold before the courts? I mean, these gentlemen persuaded Judge Snyder in Whatcom County to approve their settlement with Doug Radke's minor children by saying, oh, this won't affect her appeal. She can still go forward with her appeal to the Ninth Circuit. And as soon as the ink was dry on that, they filed a motion with this court to dismiss her appeal because they say, well, gosh, it's moot. It's moot because we've settled with Doug Radke's minor children. But that's blowing hot and cold. I know that it's an abuse of discretion standard, but when a court applies the wrong legal standard, and it's very clear from the record that Judge Martinez did say, I'm going to do this, notwithstanding that there's no evidence of chicanery or playing fast and loose, of concealing anything, that that's applying the wrong legal standard, which is, if so facto, an abuse of discretion. Excuse me, counsel. I have a very quick question and observation. My concern here, and I have, having gone to law school in Texas myself and having a son-in-law who's a federal judge down in that southern district that you live in. Your son-in-law is? He is. Which one of our judges? He's a magistrate judge in Laredo. I have a concern about the issue here that you raise about the court not being able to rely upon a decision of a lawyer who takes a position for a client. Now, regardless of whether this lawyer who did not file the appropriate claim was right or wrong, the fact is the claim didn't get filed. And the bottom line is, if that suddenly becomes subject to collateral attack at a later time, the courts are going to be flooded with people who come back and say, gee whiz, my lawyer just didn't take me seriously, or my lawyer didn't file my claim when they should have, and I should be able to relitigate that. That's why we have malpractice lawsuits against lawyers. If they don't do that, there is another avenue for relief, theoretically at least. It looks to me that that's what the district judge looked at and said, look, okay, maybe this lawyer didn't do the right thing by your client, but we can't open the floodgates here and let everybody come in and just invalidate what they didn't do or did do on the theory that maybe their lawyer gave them some bad advice. Judge Edra, I think the answer to that is the Hamilton case. That's the case they rely on specifically. And in that case, the lawyers had taken a position, but it was clear that the lawyers and the client were playing fast and loose with the courts. This was a sophisticated litigant who was already pursuing a claim, and his lawyers knew about it and he knew about it. There was clear chicanery. We're not talking here about a situation where Mr. Hathaway necessarily did anything wrong. I mean, he investigated the situation before. He called the lawyers, the Washington lawyers that Yvonne had said I'm consulting with, and then he made a decision there is no viable claim to disclose. We're not talking really about imputing to the client some wrongdoing on the part of the lawyer. We're talking about the fact that for judicial estoppel under the decisions of this court, including two which I'll give you this year after the briefs were filed, it requires some kind of chicanery. Chicanery is the word that comes right out of the Jones case, but it was mentioned again in Whaley v. Balik, 520 Fed Third 997. No, I'm sorry. It was mentioned in U.S. v. Abraham, 522 Fed Third 1003. Both of those this year where this court said for us to deny a litigant a day in court on the basis of this extraordinary doctrine of judicial estoppel, that person's going to have to have done something wrong. Isn't it true that she went back and reopened the bankruptcy and did enlist this potential asset? Yes, it is, Your Honor. I was totally unaware of this situation until the motion hit my desk on a Friday afternoon. And by Monday, we had talked to the bankruptcy trustee at his instruction and suggestion, had reopened the bankruptcy, converted it from a 7 to a 13, so that if we prevailed in our wrongful death claim against these people, then whatever creditors had not been paid would in fact be paid. But of course you would reopen it once it came to light that it hadn't been put on the schedule. Of course you would do that. Sure you would. But that doesn't change the fact that your client was aware of this. The client takes some responsibility, too. When you file a bankruptcy schedule, the person who's filing bankruptcy is supposed to sign under penalty of perjury that these are all my assets. She knew that was an asset because she knew that she was going to file the lawsuit. So regardless of whether the attorney thought it was worthless or not, she thought it was worth pursuing because here we are. And so I don't necessarily think that all of the responsibility lies with the attorney. Your client is not necessarily unfamiliar with the courts either. So I don't necessarily view her as being, you know, someone who was just a victim of circumstances. There's no evidence and no finding, Your Honor, that she did anything wrong or in fact that she knew of this. In fact, you know, you've got lawyers would know what a phrase chosen action is and that that's an asset. A person with a 10th grade education who does not have a sophisticated history of litigating things would not know that. And so what she does is disclose to the lawyer, and I'm investigating this. And, you know, this lady was beyond histrionic over the death of her husband. And this lawyer did investigate. He didn't just drop the ball. And he talked to some people who said, now, I've already declined her case. And as the record shows, we had not committed to pursuing her case. So she didn't know that a lawsuit would be filed. All we had said was we're going to get some records and investigate whether there's a case here or not. She really didn't, and there is no finding of anything wrong on her part. This is the difficulty with going back and trying to ascribe, you know, responsibility or fault for something that happens like this, because you get into a mini trial of who's, you know, who's worthy, who's not. And it's just difficult for judges. We have to take it on face value that the pleadings that are filed with us are complete, accurate, and true. And it's really difficult to go back after the fact and try to say, well, she did know, she didn't know, he did know, he didn't know, in terms of applying judicial estoppel. And the district court judge, you know, is closer to the situation than we are, and it's difficult for us to try to have a mini trial about, you know, whether or not someone should be estopped from being held to a pleading that they filed in the court. I understand that very well, Your Honor. And if he had conducted an evidentiary hearing and if he had received evidence and if he had said, you know, I make a finding of fact under the sword and buckler of 52A that she knew and she deceived the courts and she manipulated and she played fast and loose and all of those things. All of the judicial estoppel cases don't require playing fast and loose. All of them do not. If a position is taken and then you advance your position by taking an opposite position, that's sufficient for judicial estoppel. It does not necessarily require that there be some chicanery, as you put it. Your Honor, the two cases I just cited to you decided this year by this court both specifically say that. Those are not only cases in the universe of cases on judicial estoppel. No, I understand. But this court's decision from way back, and including Hamilton, on which they principally rely, all of them have required some kind of wrongdoing on the part of a litigant. You know, we have some other issues in this case that I would like to hear about, Counsel. We do, and there are many, Your Honor. I'd like to talk about many of them. Is there one in particular you'd like me to address? Well, we have to know whether her status is such that she can pursue this suit. Right. I think that's pretty critical. I think it is critical, and I think Summers is the answer to that. This court decided in 1972 in Summers that a defendant that had not filed a specific negative avertment required by the rules in exactly these circumstances had waived any claim to the capacity to sue. Von Radke was under no obligation, nor was I, to specifically plead her capacity to sue. A defendant has that obligation under the federal rules, and in Summers and the two cases subsequently, which we cited in our briefs, this court squarely held that that's waivable and is waived when it's not raised by the specific pleading. Now, what do we do with the settlement in Whatcom County in the probate and the capacity of the personal representative to sue? It was very clear in that settlement that the only people to get money were the children, and that the personal representative specifically, I mean, it said in their release, not a pennies to go to Mr. Vickery, not a pennies to go to Ms. Radke, so there's no consideration for any release of her claim as a sestouille. So I think that, frankly, I think if you were to apply judicial estoppel, these people should be judicially estopped from securing judicial approval of that settlement and then claiming that that released Yvonne's claim. As I understand the Washington law, the estate can bring suit for the harm to the victim prior to his death, but there is a right in the beneficiaries that should be prosecuted by the personal representative, but the payments do not go through the estate for any damage to the individual on account of the death. So did she have, the personal representative, as a representative of the estate have the capacity to determine and release the rights of the surviving persons who are listed as beneficiaries in the statute? She has the authority to release a wrongful death claim. She has the authority to bring it, but she brings it in a representative capacity, like for beneficiaries as of a trust. So the facts in this case is very clear that there's no consideration to anyone other than the two minor children, and there's a severability clause. There's two different statutes and two different kinds of actions. She maybe could have released the damage to the decedent, but I'm not sure that she, in her capacity, she brings a suit, but the payments are outside the estate and go to the individuals who are statutorily beneficiaries. Under the Wrongful Death Act, that's right. It's a preemption issue, and it's 21 CFR section 314.97. I can't say it any simpler than that. Is that issue before the Supreme Court? That issue is not. The Levine case deals with the preemption, and that was argued November 3rd, with a preemption of claims against Pioneer Drugmakers. These people have not challenged the fact that a claim against Lilly, the maker of Prozac, would be preempted. What they've said is, we're different, we're generic manufacturers, and that regulation says, no, you're not different. You have the same rights and the same obligations to strengthen your label that the Pioneer Drugmaker does. That's in the regulation, and it's in the statute that was passed last year. So you don't need to wait for Levine to decide this one. They could have made the same decision, and they've cited some recent cases. No matter how Levine comes out by the Supreme Court, it's going to have any application here. We never know until we read what the Supreme Court reads. But I think it's highly unlikely, because the claim to preemption here hinges on the fact that they are a maker of a generic drug rather than a branded Pioneer drug. And the cases they've cited by letter to the court all just ignore 314.97 as if it didn't exist. And that's the regulation. It seems to me in the Wyatt case, or whatever we want to call that case, that there is an issue about the obligation of the manufacturer to strengthen the label if they need to do it. And so it seems to me that's kind of an issue here also, that we should maybe wait for that case? I don't think so, because the regulation as to Pioneer manufacturers is 314.67. And 314.97 is the parallel regulation as to generics. And it's very clear under the regulations promulgated by the FDA that they have the authority and the ability and the obligation to strengthen the warning. So I wouldn't get bent out of shape if the court said, you know, the Supreme Court may write something. We're going to hold this decision until they do decide it. And quite frankly, I suggested in my brief that one of the things, there's another issue I haven't had time to argue, learned intermediary. You might want to certify that to the Washington Supreme Court. Was that raised in district court, that issue of learned intermediary? Yes, Your Honor, it was. They raised it in their summary judgment motion, and they've cross-appealed on the learned intermediary doctrine. And as we pointed out, it was adopted as a common law defense to a common law cause of action three years before Washington passed a wrongful death statute. And Orison, your next-door neighbor, has said in the same circumstances, it's a legislative judgment now, and that defense was not put in there by the legislature. And it won't be a defense to the statutory cause of action for strict liability. And since the briefs were filed on August 22nd of this year, another court has predicted that he wouldn't certify. I asked Judge Browning in New Mexico to certify that issue to the New Mexico Supreme Court. And Lillie objected and said, no, no, you have to decide it, Judge. And he did, and he said, I predict that today the New Mexico Supreme Court would not adopt this doctrine. And that's reported, it's not in FEDSUP 2nd, but it's 2008 Westlaw 433-071. And that's reported in FEDSUP 2nd, but it's 2008 Westlaw 433-071. So if you're going to wait for Wyeth v. Levine, you might consider whether or not you want to make the eerie prediction yourself as to whether Washington would today adopt this common law defense to a statutory cause of action, or perhaps certify it to the Washington Supreme Court. I'm a disciple of John R. Brown, for whom I clerked, and I believe very strongly in certification. Thank you, counsel. We'll give you a couple minutes for rebuttal. This is a complex case. Good morning. May it please the Court. John F. Sorrow, on behalf of defendants Dr. Reddy's Laboratories, Inc., and Pharmaceutical Resources. Could you put the mic a little closer to you? There are four reasons to affirm Judge Martinez's dismissal of the plaintiff's claims in this case. First, what was subject to some lengthy discussion in relation to Mr. Vickery's presentation is the judicial estoppel issue. And Ms. Radke is judicially estopped from pursuing her self-described multimillion-dollar wrongful death claim because she failed to disclose it in her bankruptcy petition. At the time that the bankruptcy filings were made, had there been any decision that she could start such a case? Well, I guess that raises an ancillary issue, Your Honor, because the plaintiff in this case represented in her complaint four different times. In the caption to her complaint and in sworn deposition testimony that she was, in fact, the personal representative of the estate of Doug Radke, that never was true. As we stand here today... And I'm going to get to that. And a real quick distinction is I think what you're going to find is that all the cases that Mr. Vickery cites on judicial estoppel do not include a single case from the Ninth Circuit that indicates that the standard in the Ninth Circuit is anything other than if the plaintiff has not filed a suit. That's what every case in the Ninth Circuit in the bankruptcy context says. Every single case, and there's two more I'll cite to you today, so I guess I would just caution that with respect to the two cases that Mr. Vickery cited to you, you take a look at those and see whether, in fact, they're in the bankruptcy context because it is sort of law unto itself and a different analysis. That's very clear and very consistent in the Ninth Circuit. I'm going to quote a statement that Mr. Vickery made to Judge Martinez at oral argument on the judicial estoppel issue below. He told Judge Martinez, did Yvonne think that she had a potential case against the makers of the Prozac or generic Prozac? Well, of course she did. She contacted a lawyer who specialized in that and asked me to investigate it. And I told him that Yvonne Radke was a bankruptcy pendant. Her lawyer was sending a letter to the coroner in Kansas where Mr. Radke shot himself representing, I represent Yvonne Radke in a wrongful death claim and requesting samples so that he could have them tested. So while the bankruptcy is pending, Ms. Radke is actively pursuing the wrongful death claim. That's not even the standard, but it goes beyond that. And I'm going to take issue with the statement or contention that there's no evidence that Ms. Radke played fast and loose in conjunction with these proceedings. I think the first proof of that is the fact that she misrepresented her status as the personal representative of the estate again and again and again and again in these proceedings. And, in fact, she's never held that capacity, which brings me to the issue of the settlement in this case. When Brianna Radke had a statutory right to be appointed the personal representative, she was the widow of the decedent. When it came to light that she had not disclosed the claim in the bankruptcy, when it came to light that she was not the personal representative of the estate, when it came to light that no estate had ever even been opened, when all that came to light, she advocated for Brianna Radke, the adult daughter of Doug Radke, to be appointed as the personal representative of the estate. Her choice. She suggested and advocated for that. In doing so, she advocated decision-making responsibility as to how and on what terms claims such as the wrongful death claim would be settled, when and on what terms. Well, counsel, why, when she came to the settlement hearing and asked whether or not the settlement would preclude her claims, why was she told that they would not affect her ability to assert her claims? Your Honor, I've read that transcript probably half a dozen times before I came here today, and Ms. Radke received conflicting information from the judge. First of all, there's no doubt as to what the release states. Ms. Radke released every claim that the estate could bring on behalf of every single statutory beneficiary. I'm happy to read the language to you. Under every single wrongful death statute, and to answer a question that you raised earlier, only the personal representative can raise any of the claims under the wrongful death statutes. That's clear. Only the personal representative has the ability to resolve those claims. That's clear. She resolved all those claims. But aren't there other claims in the debt that the estate does not have to bring? No, she has no other claims. The appeal is moot. I mean, her claims have been resolved. What about the survival actions? It's only under the wrongful death statute. Personal representative has to bring it. But it doesn't go through the estate. I mean, our statutes tell you a lot about this, but it's on behalf of the statutory beneficiaries. And the payments are the statutory beneficiaries. So we have two different situations. She could release, probably, prudently or imprudently, claims that the deceased himself had for whatever happened. But the statutory claims for the statutory beneficiaries, although brought by the personal representative, are not brought on behalf of the estate. But only the personal representative can bring them, and only the personal representative can resolve them. And that's what happened. Whether or not they could be brought, I don't mean to interrupt, Your Honor. There's a real question as to whether she could release the rights of the statutory beneficiaries. I would be careful to argue with the statutory beneficiaries. She practiced for many years at Washington, so tread lightly. I will tread as lightly as I can. All I can do is quote some of what Ms. Radke was told at that hearing. And this is Judge Schneider speaking directly to her. This doesn't preclude you, as I understand it, from bringing claims except those claims which arise through, essentially, through the estate here. Right. But if she has individual claims from some other basis, they wouldn't be precluded from this, I wouldn't think. Mr. Hansen said, no, but it would preclude a claim on behalf of the estate. Right, right. That's what I understand. That's consistent. If there were claims that were for the beneficiaries that don't pass through the estate, they are not precluded, then, by that settlement. Why would that language preclude a claim that she had that did not pass through the estate? Why would that language preclude? Only she can resolve that claim as the personal representative. She's got to bring it in that capacity so only she can resolve it. Ms. Radke never occupied the status of personal representative. She can never pursue the claim in the interim. But could the personal representative waive a claim that's for the benefit of Ms. Radke? Yes. Yes. She released a claim. Were you there in the courtroom? Was someone on behalf of your side in the courtroom? My co-counsel, Mr. Johnson, was there. This doesn't smell very good. Ms. Radke was unrepresented, right, at that point. She was there per se at that point, right? But was counsel there? No, Your Honor. Her counsel was not there. I mean, Mr. Vickery's not admitted to practice law in Washington. She opted not to hire a lawyer. She went to the hearing by herself. She hired a lawyer to represent her for the wrongful death claim. She hired a lawyer to represent her in her bankruptcy. This was a limited proceeding. It certainly wasn't beyond the realm of possibility for her or Mr. Vickery to hire a lawyer to come to that hearing and represent her. We understand that. We just want to know what happened. What happened was the personal representative that she selected, she advocated for Breonna Radke. She gave her the ability to make the decision. And, Your Honor, to answer your question, she resolved her own claims that didn't flow through the estate, Breonna Radke. She resolved the claims of Theo Radke, the miner's son, who didn't flow through the estate. She settled all those claims. I don't understand what the distinction is. It's fairly obvious to me that Ms. Radke did not intend for Breonna to resolve her claims. And she was there in an effort to try to make sure that her claims were preserved for her to pursue. That's what it looks like to me. Your perception is your perception, Your Honor, and I won't debate it with you. But I will raise the point that one of the few areas where this Court has no jurisdiction is with respect to Washington State Probate Court matters. Well, but we do have to answer the questions that are before us. And one of the questions is whether or not she had the ability to bring an action still under Washington law. I maintain absolutely that she has no ability to bring any claim anymore and that that claim has been released. Well, there is the question of whether your side raised the issue of capacity in the principle suit. And we cited the case Massoud v. Salini, Your Honor. I mean, first of all, when you allege four times in your complaint, under Rule 11, counsel and Ms. Radke has an obligation to know that the statements and the allegations they're making are truthful. It's almost as if you're a fool. That doesn't help you on the negative affirmative that you have. Well, we raised – we denied it every time. But on the basis of standing is the way you denied it. We raised lack of subject matter jurisdiction. And let me – there's another issue here, Your Honor. May I? Standing is an issue of subject matter jurisdiction, not of capacity. I think there's been some bad lawyering on both sides, frankly. Well, I'm sorry you feel that way, Your Honor. Not feel. I have determined that. With respect to the issue of capacity, even assuming that that's true, since that time Yvonne Radke has waived her status, her ability to be the personal representative of the estate. She advocated for somebody else to occupy the – I mean, what case law says that you've waived the ability – could I finish? I'm sorry, Your Honor. What case law says that you can waive your ability to challenge the lack of negative affirmative? What case authority are you relying on to say that she has waived her ability to contend that you failed to negatively aver her lack of capacity? What case says that? How does she waive that? I think you misunderstood what I said. I think you misunderstood what you said. That may be, Your Honor. Ms. Radke waived her ability to be the personal representative. Somebody else has already occupied that role. Somebody else has taken the estate to conclusion. Somebody else has closed the estate. That's two different issues. The issue becomes when she tries to become the personal representative, then you have the responsibility to say you cannot be the personal representative. You have advocated that responsibility, but you did not do that. So whether you have that position to take or not, you didn't preserve that argument by saying in the negative affirmative that she had waived or whatever term you want to use, had done that. So where in the record did you specifically put the court on notice that you were challenging her ability to be a representative? Where in the record did you do that? That's the first footnote in our motion for summary judgment. In a footnote? You did a negative affirmative? What did it say? It said that we have the plaintiff represents an electrician. She's the personal representative of the estate of Doug Radke. We have no evidence to indicate that, in fact, that she is. They haven't found any proof. And when was that filed? I don't know the date that we filed our motion for summary judgment. I haven't committed that to memory, Your Honor. Does that have to be in a pleading, a responsive pleading, a negative affirmative? I think it can be raised in various manners, Your Honor. What case authority are you relying on to support your argument regarding when a negative affirmative can be raised? The case we cite in our brief is Massoud v. Salini. And what does that say? Well, that case stands for the proposition that where a defendant raises standing, that's sufficient to raise the issue of capacity. That's what the case says. Okay. Never mind. In an answer. I have a couple issues. You said you didn't do it in an answer. You didn't do it in your answer. Well, we raised lack of standing, lack of subject matter jurisdiction, and specifically denied in each of the four instances in which she said, I'm the personal representative of the estate. We said we deny that. Okay. Go ahead. Move on. The seminal case is Hamilton, Your Honor. In the bankruptcy context, judicial estoppel is imposed when a debtor has knowledge of enough facts to know that a potential cause of action exists during the pendency of the bankruptcy but fails to amend her schedules. Now, I cited to you Mr. Vickery's quote where he acknowledges that she knew. That's undisputed. It's in the record. She knew she had a claim. She was actively pursuing her claim. Since Hamilton, very recently, November 2007, and again in September 2008, just two months ago, the Ninth Circuit Court of Appeals in the bankruptcy context has reaffirmed that standard. The first case is Elston v. Westport Insurance Company, Ninth Circuit Appeal Number 05-17828. Have you cited that to us in the 28-J letter? No, I didn't, Your Honor. Would you do that? Yes, Your Honor. In that case, the court held, we, the Ninth Circuit, have held that the inquiry, the inquiry, is whether the debtor had knowledge of enough facts to know that a potential cause of action exists during the pendency of their bankruptcy. Another case is Rose v. Beverly Health and Rehabilitation. Nor does Rose's claim subjective ignorance of the disclosure requirements prevent the application of judicial estoppel. At the time she filed for bankruptcy, Rose knew the facts giving rise to her claims, and her request for a right to sue letter demonstrates she knew these claims were potentially valuable. In each instance, in the bankruptcy context, judicial estoppel applies. You knew you had a claim. You didn't disclose it. That is the standard in the Ninth Circuit. Mr. Vickery can't cite you to any Ninth Circuit cases and say otherwise. All right, counsel, you've exceeded your time. Thank you. Rebuttal. Two minutes. Thank you, Your Honor. I don't know about the first case that Mr. Ipsarro just cited to you, but I do know about the Rose case, and it's an unreported opinion. It's an unreported opinion, which under Rule 36.3, he's not supposed to be citing to you as authority for that. I'll bet the other one is unreported, too, because I've tried to update. Under our current rules, they can be cited not as precedent but as persuasive authority. Right. That's kind of new with us. But it shouldn't be disclosed if you're citing an unreported case. It should be disclosed that it's unreported so we can give it the weight to which we think it's entitled. Right. And I know the Rose case he just cited is unreported because I just read it this morning. I don't know the other. Rule 9 specifically says unless it's required to establish jurisdiction, a party need not allege the party's capacity to sue or to be sued. Now, I think that sometimes the defense confuses jurisdiction with capacity. Jurisdiction cannot be waived, but capacity can. And the Summers case, which is 1972, is squarely on point factually and legally and said that when it was not raised by a pleading, a timely pleading, then it was waived by them. If it's waived, then she has the capacity to sue, and, of course, she is the beneficiary of the statutory wrongful death action. Now, if there are other questions from the court, I'd love to address them. I think not. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court. The final case on calendar for argument today is FMC Technologies v. Edwards.
judges: Fletcher, Rawlinson, Ezra